IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| INTERNATIONAL UNION OF POLICE ASSOCIATIONS, AFL-CIO 1549 Ringling Blvd, 6th Floor Sarasota, Florida 34236<br><br>and<br><br>JONATHAN WASHER<br><br>Plaintiffs,<br><br>vs.<br><br>LEE COUNTY SHERIFF'S OFFICE 14750 Six Mile Cypress Pkwy Fort Myers, Florida  33912<br><br>and<br><br>SHERIFF MICHAEL SCOTT 14750 Six Mile Cypress Pkwy Fort Myers, Florida  33912<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

2:10-cv-415-FtM-29.SPC

FILED

2010 JUN 30  PM 12: 54

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

Come now the International Union of Police Associations, AFL-CIO, and Jonathan Washer (jointly called Plaintiffs), complaining of the Lee County Florida Sheriff's Office, and Sheriff Michael Scott in his official capacity, (jointly called Defendants) and for cause of action would show unto the court as follows:

I.
## PARTIES

1.    Plaintiff International Union of Police Associations AFL-CIO, is an unincorporated association comprised of law enforcement and other public voluntary membership police employee associations, or a labor union, organized and existing in part to advocate for fair pay and working conditions for law enforcement officers employed by the Sheriff of Lee County Florida. The I.U.P.A. is headquartered in Sarasota Florida, and is authorized by Florida Statute to sue in its own name. Florida Statutes, Section 447.11.

2.    Plaintiff Jonathan Washer is resident of Lee County who is employed as a Sergeant by the Lee County Sheriff's Office. (Plaintiff Washer's address is confidential pursuant to Florida Statutes Section 119.071, and is therefore excluded from this pleading.)

3.    Defendant Lee County Sheriff's Office is the law enforcement agency for Lee County, Florida operating within its geographical boundaries as authorized by the Florida Constitution.

4.    Defendant Michael Scott is the Sheriff of Lee County, Florida and he is sued in his official capacity.


II.
## JURISDICTION AND VENUE

5.    Jurisdiction is conferred on this Honorable Court by 28 U.S.C Sec. 1331 and Sec. 1343(a)(3)42, to redress the deprivation of Plaintiffs' rights, privileges and immunities

pursuant to 42 U.S.C. Sec. 1983 and 42 U.S.C. Sec. 1988.  Federal question jurisdiction is conferred on this Court because this action arises to redress violations by the Defendants of Plaintiffs' rights under the Constitution and laws of the United States, including but not limited to the First Amendment to the United States Constitution.

6.   Venue is proper in the United States District Court pursuant to 28 U.S.C. Sec. 1391(b) because this is the judicial district where the majority of the events or omissions giving rise to the claim occurred.

## III.
## FACTS

7.   Jonathan Washer is currently employed as a Sergeant by the Lee County Sheriff's Office.

8.   Washer was hired by the Sheriff's Office in June of 1995 as a Deputy Sheriff.  In 2000 Washer passed the test for promotion to Corporal, and was promoted to the position of Corporal.  As a Deputy and Corporal Washer served extensive time on road patrol, and in details such as the Traffic Unit and the Driving Under the Influence Unit.  Additionally, Washer was assigned the duties of a shift supervisor in the East District patrol division.

9.   In 2002 Washer passed an examination for, and was selected for, the position of Detective in the Criminal Investigations Division.

10.  In June of 2005, the Sheriff's Office created the Economic Crimes Unit.  This Unit is assigned to investigate Economic Crimes, such as mail and bank fraud, racketeering, identity theft, and computer crimes.

11.  Initially, there were approximately four detectives in the Economic Crimes unit, and one

3

Sergeant, Mark LeBlanc. Washer was one of the initial members of the Economic Crimes Unit. The Unit is currently staffed by nine detectives, and five civilian staff.

12. In 2005 one of the detectives in the Unit, Richard Barnes, was promoted to Sergeant. Barnes remained as a Sergeant in the Economic Crimes Unit until his retirement in 2008.

13. In 2005 Sergeant Le Blanc was promoted to the position of Lieutenant. LeBlanc remained as the Lieutenant of the Economic Crimes Unit until his retirement in 2008. Prior to his promotion to Lieutenant, LeBlanc was not required to transfer out of the Economic Crimes Unit.

14. In 2007 Washer passed the test for Sergeant and was placed on the promotional list. In August of 2007, Washer was offered a promotion to the position of Sergeant. Washer discussed with Sheriff Scott his concern that he would be transferred out of the Economic Crimes Unit if he was promoted to Sergeant. Sheriff Scott assured Washer that he would remain in the Economic Crimes Unit if he was promoted. Therefore, Washer accepted the promotion to Sergeant, and he was designated as the Sergeant in charge of detectives in the Economic Crimes Unit.

15. When Lieutenant LeBlanc retired in July 2008, Washer was placed in charge of the entire Economic Crimes Unit.

16. As the supervisor over the Economic Crimes Unit, Washer's duties included to supervise nine detectives and five civilians including an analyst; to review and assign incoming cases from new victims and outside agency referrals; to review and approve reports from Unit detectives; and to conduct training for Unit personnel.

17. Lieutenant Shawn Ramsey is Washer's supervisor. Ramsey oversaw the Economic Crimes

Unit, as well as the Auto Theft Unit and the Robbery Section.

18.   Major Jim Jones is the commander of the Criminal Investigations Division, and is the supervisor of Lieutenant Ramsey and Sergeant Washer.

19.   In his five year tenure with the Economic Crimes Unit, Washer became a specialist in Economic Crimes. Washer attended training seminars held by the International Association of Financial Crimes Investigators (IAFCI), the National White Collar Crime Center (NW3C), the Association of Certified Fraud Examiners (ACFE), and the Florida Department of Law Enforcement (FDLE).

20.   In 2008 Washer passed an exam and became a Certified Fraud Examiner. Washer is the only Certified Fraud Examiner in the Lee County Sheriff's Office.

21.   Washer authored an article on economic crimes in the *Informant* magazine, published by the National White Collar Crime Center, and he authored a chapter in an upcoming book for law enforcement on internet fraud, the *Internet Fraud Casebook*, to be published by the Association of Certified Fraud Examiners.

22.   Washer has also received numerous commendations and awards, including two Grand Cordon Awards for exceptional service.

23.   Washer's expertise was recognized by the Agency. In May of 2009, Lt. Ramsey commented on Washer's performance for his performance evaluation: "Sergeant Washer recently assisted outside agencies develop policy to deter identity theft. His knowledge in this area is second to none. Sergeant Washer is routinely called upon by local, state and federal agencies to assist in the field of Economic Crimes. The Lee County Sheriff's Office Economic Crimes Unit continues to grow under Sergeant Washer's supervision to address this growing crime

trend."

24. During his tenure as Sergeant, Washer received performance evaluations that were either above standard or excellent.

25. Lt. Ramsey summarized Washer's 2009 evaluation, "I am confident that you will be satisfied with the evaluation as you and the other unit members continue to do an[] exceptional job and I realize the important role you play in supervising the unprecedented progress the unit has made during the course of the last year."

26. During his tenure, Washer has never been disciplined or proposed for discipline.

27. In 2009 and 2010, as a Sergeant in the Economic Crimes Unit, Washer was entitled to an additional $2,000 per year in incentive play, plus $800 per year as a uniform allowance.

28. In April of 2010, the I.U.P.A. began to organize Sergeant's in the Lee County Sheriff's Office. From the inception, Washer was the leader of the group of Sergeants seeking to organize with the I.U.P.A. Washer met with numerous I.U.P.A. officials, including the International President.

29. Washer advocated for the I.U.P.A., and advocated to have other Sergeants join the I.U.P.A., and sign cards seeking to have the I.U.P.A. designated as the bargaining representative for the Sergeants.

30. Washer also communicated with other Sheriff's Deputies about matters of public concern. For example, Washer told other deputies that they needed assistance from the I.U.P.A. in having a say regarding what happened to the deputies in terms of benefits, fair discipline, salary, pensions, and in lobbying.

31. Washer performed these activities on his own time.

32.   Washer's activities were public. For example, Washer advocated for the I.U.P.A. on his Facebook page. This page was accessible to a number of Sheriff's Office employees, including to Major Jones.

33.   Washer's activities were also well known throughout the Sheriff's Office. For example, two days before his removal from the Economic Crimes Unit, a Sergeant from the Corrections Division of the Sheriff's Office called the Economic Crimes Unit and asked a Detective whether Washer was starting the union with I.U.P.A. Two days after Washer was removed from the Economic Crimes Unit, another Sergeant told Washer that his name had come up as being involved in the I.U.P.A.

34.   The I.U.P.A. frequently speaks on matters of public concern, including advocating for fair pay and disciplinary systems for law enforcement officers, publicizing the inappropriate actions of law enforcement employers, and providing information on the legal rights of law enforcement officers.

35.   Sheriff Scott vigorously opposed a drive to bring a union to the Sheriff's Office in late 2009. Sheriff Scott sent out dozens of emails denigrating unions generally, and encouraging employees to vote. In one instance, Sheriff Scott sent out an email linking what he viewed as a "positive attitude" regarding the union vote, to advancement within the Sheriff's Office: "In every organizational structure attitude generally translates to altitude."

36.   On June 10, 2010, Washer was called to a meeting with Major Jim Jones, Major Mathew Powell, and Lt. Ramsey. At this meeting Washer was told that he was being removed from the Economic Crimes Unit, and transferred to a road patrol assignment in the Central District. Major Jones told Washer that he was a great supervisor, and that Washer was being

7

reassigned to allow him to grow.  Washer was told that the removal was not disciplinary. Washer objected to the removal, and stated that he wanted to stay in the Economic Crimes Unit.  However, he was not allowed the opportunity to stay in the Unit.

37.   Washer was told that his removal from the Unit was effective immediately.  He was directed to turn in his equipment and his vehicle immediately.  Washer was not given an opportunity to train or update his successor.  Washer also is actively investigating twelve cases, and was overseeing over 500 cases.  However, he was not given any opportunity to close out his cases, or consult with the Detectives in the unit regarding the pending cases.

38.   Prior to June 10, 2010, Washer had not been asked if he wanted to leave the unit, nor had he been notified that he would be removed from the Unit.

39.   Instead, management appeared to have no intention of removing Washer from the Unit.  For example, on May 20, 2010, Captain James Leavens and Lt. Ramsey approved Washer's request to provide Fraud Training at a local bank later in June.

40.   Sergeant Keith Day was reassigned to take the place of Washer in the Economic Crimes Unit.  However, Sergeant Day will not arrive in the Unit for one week.  Until the Sergeant Day arrives, the Unit will be supervised by a Detective.

41.   Upon information and belief, Sergeant Day does not have any specialized experience or training in Economic Crimes.  By comparison, all of the previous supervisors of the Economic Crimes Unit had experience in handling economic crimes.

42.   Upon information and belief, when employees of the Lee County Sheriff's Office are reassigned with no notice, it is generally in disciplinary or punitive cases.

43.   When employees are reassigned for non-punitive reasons, they are generally provided with

8

notice prior to the reassignment.  For example, when Sergeant Day was transferred into the Economic Crimes Unit, he was given a week to train his successor.

44.     As a result of the reassignment, Washer will lose $2,000 per year in incentive pay, and $800 per year in uniform allowance.  In addition, Washer will work a different schedule and in a different location.  Finally, the new assignment does not carry the same prestige as the assignment to the Economic Crimes Unit.

45.     As a result of the transfer, Washer also suffered from mental distress including migraine headaches, loss of sleep, and loss of appetite.

46.     The reassignment of Washer from the Economic Crimes Unit is well known in the Sheriff's Office.

47.     Defendant Sheriff Michael Scott is a policy maker within the Sheriff's Office.  The Sheriff has the authority to make personnel decisions, including the authority to hire, fire, demote, transfer, supervise, and discipline employees in the Lee County Sheriff's, including Sergeant Washer.

48.     Upon information and belief, Defendant Michael Scott established this policy and practice of retaliation and intimidation, and did so in order to intimidate and punish officers who had advocated for the I.U.P.A., and to discourage other officers from joining the I.U.P.A.

49.     As a result of the Defendants' retaliatory actions, the I.U.P.A.'s attempts to recruit new members, and gain new cards authorizing an election, have been hindered.

50.     The above retaliatory actions were taken as part of a custom or practice of the Lee County Sheriff's Office.

51.     The above retaliatory actions were taken with the intent to discourage membership in, and to

otherwise damage, the I.U.P.A.

52.  At the time that Defendants engaged in their unlawful conduct, it was clearly established as a matter of law that discriminating, disciplining or retaliating against a public employee because of his association with a union was in violation of the employee's freedom of association rights.

53.  At this time it was also clearly established as a matter of law that public employers could neither threaten employees with discipline, retaliation or discipline for exercising their free speech rights, nor could they actually retaliate against or discipline their employees for exercising their freedom of speech rights.

54.  Defendants acted intentionally to violate, or with deliberate indifference towards, Plaintiffs' constitutional rights.

55.  In taking the above retaliatory actions, Defendants acted with malice.

56.  As a result of his removal from the Economic Crimes Unit, Washer has suffered a loss in pay, loss in benefits, humiliation, emotional distress, and other damages.

57.  As a result of the retaliation, intimidation, and harassment of its members, the I.U.P.A. suffered a loss in potential members, and a future loss in dues and other monies.  In addition, the I.U.P.A. has been compelled to incur legal, and other, expenses to combat the intimidation and harassment of its members.

III.
## CLAIMS

I. The Defendants Violated the First Amendment Rights of Jonathan Washer

58. Plaintiffs incorporate by reference all of the allegations set forth in the paragraphs above, as if set forth verbatim.

59. Plaintiff Washer engaged in free speech protected by the First Amendment of the United States Constitution, by speaking on matters of public concern, including on matters related to the pay, benefits, and fair treatment of police officers.

60. Plaintiff Washer engaged in associational activities protected by the First Amendment of the United States Constitution, by forming and associating with the I.U.P.A., and with other union advocates.

61. Acting under the color of state law, and through an established a pattern, practice, custom and policy, the Defendants harassed, intimidated, and retaliated against the Plaintiff Washer by, *inter alia*, threatening, harassing, and transferring Plaintiff Washer. Plaintiff Washer's exercise of his First Amendment right to freedom of speech and freedom of association, was a substantial or motivating factor for the foregoing actions.

62. Plaintiff Washer hereby brings suit under 42 U.S.C. Sec. 1983 for the damages he suffered due to the Defendants' violation of his rights privileges and immunities secured by the First Amendment of the United States Constitution. These damages include, but are not limited to, lost wages (including front pay), emotional distress and embarrassment, and attorneys' fees and costs.

## II.  The Defendants Violated the First Amendment Rights of the International Union of Police Associations

63.    Plaintiffs incorporate by reference all of the allegations set forth in the paragraphs above, as if set forth verbatim.

64.    Plaintiff I.U.P.A., engaged in free speech protected by the First Amendment of the United States Constitution, by speaking on matters of public concern, including on matters related to the pay, benefits, and fair treatment of police officers.

65.    Plaintiff I.U.P.A. engaged in associational activities protected by the First Amendment of the United States Constitution, by forming and associating with employees of the Lee County Sheriff's Office, and associating with other unions and employees.

66.    Acting under the color or state law, and through an established a pattern, practice, custom and policy, the Defendants injured the I.U.P.A., by harassing, intimidating, and retaliating against members of the I.U.P.A., by attempting to discouraging membership in the I.U.P.A., and by compelling the I.U.P.A. to expend funds in order to defend the First Amendment Rights of the I.U.P.A., and its members.  The Plaintiff I.U.P.A.'s exercise of its First Amendment right to freedom of speech and freedom of association, was a substantial or motivating factor for the foregoing actions.

67.    The Plaintiff I.U.P.A. hereby brings suit under 42 U.S.C. Sec. 1983 for the damages it has suffered due to the Defendants' violation of its privileges and immunities secured by the First Amendment of the United States Constitution.  These damages include, but are not limited to, lost dues income, costs and expenses, and attorneys' fees and costs.

## JURY DEMAND

68.    Plaintiffs demand a trial by jury.


WHEREFORE, Plaintiffs request that the Defendants be cited to appear and answer herein, and that upon hearing of this cause, the Court grant the Plaintiffs the following relief:

a.    Issue a judgment ordering the reinstatement of Plaintiff Washer to his position as Sergeant in the Economic Crimes Unit.

b.    Issues a judgment directing that the Defendants cease and desist from their retaliation, harassment, and intimidation of Plaintiffs.

c.    Issue a judgment for Plaintiff Washer, against the Defendants both jointly and severally, for compensatory damages, including but not limited to, lost earnings, lost promotional opportunities, lost benefits, medical expenses, past, present and future emotional injuries and mental distress, equitable relief including but not limited to front pay and benefits, and pre and post judgment interest as provided by law.

d.    Issue a judgment for the Plaintiff I.U.P.A., against Defendants both jointly and severally, for damages including but not limited to lost dues income, costs and expenses, and attorneys' fees and costs.

e.    Order Defendants to pay Plaintiffs' attorney's fees and costs, including expert witness fees.

f.    Grant such other and further relief, either at law or in equity, to which

Plaintiffs may be justly entitled.

Respectfully Submitted,

Joseph Egan, Jr.
Florida Bar No. 180102
**Trial Counsel for Plaintiffs**
Egan, Lev, and Swica
231 E. Colonial Dr.
Orlando, Florida 32801
Phone: 407-422-1400
Fax: 407-422-3658
Email: jegan@eganlev.com

Aaron Nisenson
Florida Bar Identification No. 0041739
**Trial Counsel for Plaintiffs (Application for admission
pending)**
General Counsel
International Union of Police Associations
1549 Ringling Blvd., 6th Floor
Sarasota, FL 34236
Phone: 941-487-2560
Fax: 941-487-2570
Email: gcounsel@iupa.org

14